(11 App. Div. 77.)

### DIKE v. DREXEL et al.

(Supreme Court, Appellate Division, Second Department. December 30, 1896.)

PARTNERSHIP—PAYING INDIVIDUAL DEBT OUT OF FIRM ASSETS—NOTICE.

One who receives the check of a banking firm in payment of the individual debt of a partner is not chargeable with constructive notice of misappropriation of partnership funds, since there is nothing unusual about such payment, and the presumption is that the partner has individual funds deposited with the firm to make the payment. Goshen Nat. Bank v. State, 36 N. E. 316, 141 N. Y. 379, followed.

Appeal from special term, Kings county.

Action by Norman S. Dike, as receiver of Edward M. Field and others, composing the firm of Field, Lindley, Weichers & Co., against Anthony J. Drexel and others, composing the firm of Drexel, Morgan & Co., Edward M. Field, Daniel A. Lindley, John F. Weichers, and Herman C. Hilmers, to recover payments made to defendants Drexel, Morgan & Co. From a judgment for defendants, plaintiff appeals. Affirmed.

Argued before BROWN, P. J., and CULLEN, HATCH, and BRADLEY, JJ.

James L. Bishop and Frederic A. Ward, for appellant.
Joseph H. Choate, for respondents.

BROWN, P. J. The appellant is the receiver of the co-partnership of Field, Lindley, Weichers & Co., who, during the year 1891, carried on business as bankers and brokers in the city of New York. The individual members of the firm were Edward M. Field, Daniel A. Lindley, John F. Weichers, and Herman C. Hilmers. The co-partnership was formed in April, 1891, and was the successor of the firm of Field, Lindley & Co., of which latter firm said Edward M. Field and Daniel A. Lindley had been members. The firm of Field, Lindley & Co. was indebted to the firm of Drexel, Morgan & Co., the respondents on this appeal, in a sum exceeding $500,000, for which Drexel, Morgan & Co. held Field, Lindley & Co.'s demand notes, and certain collateral securities, and the guaranty of Cyrus W. Field, who was the father of Edward N. Field. The trial court found as facts that:

"Throughout the existence of the new firm, its business and affairs were conducted absolutely and wholly according to the direction of Edward M. Field, to whom the other three partners confided the unrestricted, absolute, and entire control and management of the business, allowing him to conduct it as though it were his own, and in its behalf to incur liabilities, and dispose of assets absolutely according to his own judgment. To the defendants Drexel, Morgan & Co. the business of Field, Lindley, Weichers & Co., as conducted by Edward M. Field, was apparently the same as, and a continuation of, that of Field, Lindley & Co., and such appearance was a natural result of the conduct and acquiescence of the other members of the new firm from the formation and during the entire continuance thereof. In fact, the business and assets of Field, Lindley & Co. were so mingled with those of Field, Lindley, Weichers & Co. as to establish a practical identity between the two firms."

After the formation of the new firm frequent demands were made upon Field by Drexel, Morgan & Co. for the payment of the said indebtedness, and Field had agreed to pay $100,000 on August 8th. On that day he drew a check of the firm of Field, Lindley, Weichers & Co. upon the Seaboard National Bank for the sum of $100,666.67, payable to the order of William T. Litson, who was a clerk in the employ of said firm; and said check, having been indorsed by Litson, payable to the order of Drexel, Morgan & Co., was sent by Field to Mr. Coster, one of the members of the latter firm, in a letter, in which he wrote as follows:

"I inclose herewith our check, certified, to the order of Drexel, Morgan & Co., for $100,666.67, which includes interest at six per cent. to August 10th. Will you

please keep the securities until next week.     I will let you know as early as possible the day you may expect the next payment."

On August 30th, Field sent to Drexel, Morgan & Co. a second check of the said firm of Field, Lindley, Weichers & Co., upon the Seaboard Bank, payable to the order of Drexel, Morgan & Co., for $30,255.11.     Both of these checks were signed, "Field, Lindley, Weichers & Co., per pro. Field, Lindley, Weichers & Co.," and both were certified by the Seaboard Bank before they were sent to Drexel, Morgan & Co.     Both of them were deposited by Drexel, Morgan & Co. in their bank, and applied in payment of the indebtedness of Field, Lindley & Co.     The first check was applied to pay two notes, one of $70,000, and one of $30,000; and the amount of the check corresponded exactly with the amount of principal and interest of said two notes, and the payments were indorsed on the notes as follows: "Interest and principal paid August 8th, 1891."     The notes, however, were not delivered to Field, but were retained by Drexel, Morgan & Co.     The second check was applied upon a note of $70,000, dated June 24, 1890, and indorsed thereon as follows:     "August 20th, 1891, received $30,000 and interest to date."     The letter in which the first check was inclosed was written upon the paper of Field, Lindley, Weichers & Co., which gave in full the name of each member of the firm.     At the time the payments were made, the firm of Field, Lindley, Weichers & Co. was insolvent, and on November 27, 1896, they made a general assignment for the benefit of their creditors.     This assignment was subsequently set aside at the suit of a creditor, and the plaintiff was appointed the receiver of the firm, and this action was brought by him to recover from Drexel, Morgan & Co. the payments made to that firm, as aforesaid.

The trial court further found that:

"Drexel, Morgan & Co. received these two checks in absolute good faith in payment of their said debts to the extent of such checks.     They then believed, and had no reason to doubt, that Field, Lindley, Weichers & Co. and all its members were absolutely solvent, and that said firm and the said Cyrus W. Field were possessed of and controlled ample means.     Drexel, Morgan & Co. did not know William T. Litson, the payee of said check of August 8, 1891, nor did they know his relation to the firm of Field, Lindley, Weichers & Co.     Drexel, Morgan & Co. did not know, nor did they suspect, nor were they informed until February, 1894, that these checks had been delivered or paid to them without full authority. In the meantime, and in perfect good faith, Drexel, Morgan & Co. had made a final settlement of all their claims against Cyrus W. Field, then deceased, and his estate, on account of his guaranty of said indebtedness of Field, Lindley & Co., and had forever and finally released his estate from any and all further claim on account thereof.     In making such settlement, and in giving such release, Drexel, Morgan & Co. in good faith, and in recognition and confirmation of the said two payments of August 8 and August 20, 1891, and relying upon such payments as an actual extinguishment of that extent of the debt of Field, Lindley & Co., did accept, in discharge of the obligation of Cyrus W. Field upon his said guaranty, such sum, and only such sum, as was sufficient to pay the said indebtedness of Field, Lindley & Co. remaining unpaid after allowing and deducting as payment the whole amount of the said two checks of August 8 and August 20, 1891, and after applying in payment thereof all the collateral securities, excepting certain certificates of stock of the Washington Building Company, which were fictitious and worthless.     The use of these moneys or checks by Edward M. Field, in payment of the debts of Field, Lindley & Co., was permitted and acquiesced in by all the members of the firm of Field, Lindley, Weichers & Co., in

the sense that they allowed him absolute and unrestricted control of the moneys of the said firm."

It appears, however, in the testimony, that the action of Field in making these payments was unknown to his co-partners until after the making of the assignment. The payments appeared on the books of the firm as a loan made to Drexel, Morgan & Co., in the following form:

Dr.   Drexel, Morgan & Co., in Account Current with Field, Lindley, Weichers
                            & Co.   Cr.

Loan Account.

1891.
August 8th.   To Cash.................................................$100,000
August 20th.   "     "     ............................................. 30,000

The transaction, so far as the other members of the firm were concerned, must therefore be deemed wholly unauthorized. The learned judge at special term gave to the certified check the character of money, and treated the payments made to Drexel, Morgan & Co. as if they had been made in money, and applied to the case the familiar rule that where money is received in payment of an existing debt, without knowledge or means of knowledge on the part of the one receiving it that the debtor paying had not rightful ownership of it, the payment is good, and the recipient is under no legal obligation to repay it to the rightful owner. It is the claim of the learned counsel for the appellant that this principle has no application to the case presented. In his argument he distinguishes in reference to the right of recovery between a creditor's action and an action by the owner of the misapplied property, and contends that the payments made to Drexel, Morgan & Co. were appropriations of a part of the assets of an insolvent firm to the payment of individual debts of two of the partners; that such an appropriation was fraudulent as against the firm creditors; and that the presumption of fraud arose from the character of the act.

In considering the questions that are presented on this appeal, we assume that Edward M. Field knew, when he drew the checks in question, that his firm was hopelessly insolvent; that Drexel, Morgan & Co. knew of the liquidation of the firm of Field, Lindley & Co., and the formation and existence of the new firm of Field, Lindley, Weichers & Co.; that the new firm, in fact, had not assumed the debts of the old firm. The law is quite well settled that one partner cannot, without the consent of his co-partners, give a partnership obligation in payment of his individual debt, or transfer partnership property for a like purpose to a creditor who had knowledge that the property so transferred is the property of the partnership. Berniheimer v. Rundskopf, 116 N. Y. 428, 22 N. E. 1074; Bulger v. Rosa, 119 N. Y. 459, 24 N. E. 853. This rule is applicable to a case where money belonging to a partnership is paid to a creditor of an individual partner, if such creditor knows that the money received belonged to the partnership. Mecutchen v. Kennady, 27 N. J. Law, 230; In re Gallagher, 114 Pa. St. 353, 7 Atl. 237. In such a case the property or money misapplied may be fol-

lowed and recovered until it reaches the hands of a bona fide purchaser for value. But it is equally well settled that payment of money to a creditor who receives it in discharge of an existing debt, without knowledge or means of knowledge that it is the property of another than the one paying, is good, and does not create a liability on the part of the recipient to the true owner. Justh v. Bank, 56 N. Y. 478; Stephens v. Board, 79 N. Y. 167; Southwick v. Bank, 84 N. Y. 434; Newhall v. Wyatt, 139 N. Y. 452, 34 N. E. 1045; Goshen Nat. Bank v. State, 141 N. Y. 379, 36 N. E. 316; Hatch v. Bank, 147 N. Y. 184, 41 N. E. 403.

I do not assent to the proposition that a certified check, in reference to payments made with it, is to be treated as cash, or as of the character of a bank note. Such might be the character attributed to it if it was the check of a third person in no way identified with the parties to the transaction in question. A check differs materially from a bank note. The latter is issued as currency under legal restrictions which give to it the character of money. The check is not currency, although it may pass current from hand to hand. The recipient of the check must always be chargeable with knowledge of the name of the drawer thereof, and must be deemed to have such information as is properly to be inferred from knowledge of that fact. But, when the recipient of the check has collected the money upon it, he is in precisely the same situation as if he had received the money in the first instance with such knowledge as to the real ownership thereof as is to be imputed to him from the fact appearing on the face of the check. In very many of the cases cited by the respondents the individual debtor either paid to his creditor money, or gave his own check upon a bank, and no facts appeared which charged in any way the recipient of the money with knowledge that the funds paid or drawn upon were those of another person. In this respect the case before us differs from most of those cited upon the respondents' brief. Here there is no doubt that Drexel, Morgan & Co. knew that the checks they received were those of Field, Lindley, Weichers & Co. Such fact was apparent upon the face of the instruments. The signatures to the checks were both printed and written, and the letter in which the first check was inclosed had printed upon it the firm name and the names of the individual partners, and the writer therein informed Drexel, Morgan & Co. that he inclosed "our check." This expression was susceptible of no other meaning than that the check was that of the firm of Field, Lindley, Weichers & Co., and not that of Field, Lindley & Co. The money came into the possession of Drexel, Morgan & Co. when the checks were collected through their bank; and their right to retain the same is to be determined at that time, and with reference to such knowledge as they then had as to the rightful ownership thereof. There is no claim that they had any actual knowledge that the money drawn on the checks in question belonged to the firm, and all the knowledge on that subject that they are to be charged with is such as was to be inferred from the face of the checks in question.

The question, therefore, upon which the decision of this case turns, is whether the form of the checks constituted notice that the funds of the partnership were being used by Field to pay his individual debt. We must assume that the respondents knew that the funds came from the possession of the partnership, but I do not see how the checks charged them with greater notice than that; and I am of the opinion that the mere fact that the check was a firm check is not sufficient to impute to them knowledge that the money drawn thereon·was money of the partnership. It was well said, I think, in Sterling v. Jaudon, 48 Barb. 459, that the presumption might as well be indulged in that the firm held money belonging to the individual partner as that he was guilty of a fraud upon his partners. But the extent to which such a check may be treated as notice is settled, it seems to me, in the case of Goshen Nat. Bank v. State, supra. In that case the cashier of the bank, who was the county treasurer, sent to the comptroller of the state, in payment of his individual debt to the state for a balance due for taxes, a draft of the Goshen Bank upon the Importers' & Traders' National Bank of New York, signed by himself as cashier. This draft the comptroller received, and caused to be collected, and the money was paid into the treasury of the state. It was proven that the cashier paid no money to the Goshen Bank for the draft, and made no entry upon the books of the bank showing the drawing of the same or its use, and that he had not then or thereafter any money to his credit in the bank. It was held by the court of appeals that the state was not liable to refund the money. In that case the comptroller knew that the draft received was that of the bank, and that it was delivered to pay an individual debt of the cashier. In the case before us the respondents knew that the check received by them was a firm check, and was given to pay the individual debt of two members of the firm. In respect to the extent of the notice given by the form of the check and draft the facts of the two cases are alike. The court held in the Goshen Bank Case that the form of the draft did not constitute notice that the funds of the bank were being used to pay the cashier's private debt, Judge Peckham saying:

"He would only be so using them in case he did not pay for the draft, and its form might be the same even if he had paid for it in full. * * * The presumption would be that he had paid for the draft, and that it, therefore, was his property."

The same presumption must arise in this case. Field, Lindley, Weichers & Co. were bankers and brokers. They were engaged in a large and extensive business. Two of its leading members had been members of the old firm, and while there had been no assumption of the debts of the old firm, nor of the debt due, Drexel, Morgan & Co., the new firm, had succeeded generally to the assets and accounts of the old firm, and had, as the court found, assumed some of its liabilities. It would have been unusual to have paid so large a sum in money or currency; and, as the debt paid was that of two members of the existing firm, the natural way of paying it would have been by the check of the existing firm; and, if Field

and Lindley had deposited with the firm the money to make the payment, the manner of making it, and the form of the check used, would have differed in no respect from that delivered to Drexel, Morgan & Co. There was, therefore, nothing suspicious or unusual in paying a debt of the old firm with a check of the new concern, nor any notice that, in so doing, the funds of the new partnership were being improperly used.

In commenting upon the Goshen Bank Case, the learned counsel for the appellant says upon his brief that if the bank had been insolvent, and the officers, knowing of its insolvency, had drawn the draft in question to pay the individual debt of the cashier, in such a case the receiver of the bank could have recovered the money for the fraudulent transfer, for the reason that the transaction was between the bank and the state. We need not now concern ourselves with the question as to what would be the result of such a claim provided the payment was the act of the bank itself. But I am unable to see how the rule of law applicable to the case would have been different if the fact had been that the bank, at the time the cashier delivered the draft to the comptroller, had been insolvent. I know of no principle of law which would permit a recovery by creditors of an insolvent of money so misapplied, and, upon the same state of facts, preclude a recovery by the solvent owner of the fund.

We are of the opinion that the case was properly disposed of at the special term, and the judgment should be affirmed, with costs. All concur.